FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 DEC 14 AM 10: 18
U.S. DISTRICT COURT
N.D. OF ALABAMA

JIMMIE L. PETERSON and ALONZO  )
REESE,                          )
                                )
         Plaintiffs,            )
                                )     CV 95-BU-2260-S
vs.                             )
                                )     ENTERED
ADIENCE, INC., d/b/a "B.M.I.    )     DEC 14 1998
REFRACTORIES, INC.",            )
                                )
         Defendant.             )

Memorandum Opinion

This cause comes on to be heard on a renewed motion for summary judgment filed on September 1, 1998, by the defendant, Adience, Inc., d/b/a "B.M.I. Refractories, Inc." ("BMI"). In its motion, the defendant claims that the plaintiffs, Jimmie L. Peterson ("Peterson") and Alonzo Reese ("Reese") cannot demonstrate the existence of a genuine issue of material fact supporting their claims of race discrimination, racial harassment and retaliation under 42 U.S.C. § 1981, and their state-law claims of outrage.

On a motion for summary judgment, the court must assess the proof to ascertain whether there is a genuine need for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing

/22

this court of the grounds for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exist genuine issues for trial. Celotex, 477 U.S. at 324; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any..." in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the looking glass of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). However, incomplete or anecdotal evidence will not aid the non-movant in demonstrating a genuine issue of material fact. "The nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" Tidwell v. Carter Products, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989)).

Facts

Read most favorably to the plaintiffs, the facts as recounted in briefs in support of and opposition to the renewed motion provide essentially the same picture as that painted by the Eleventh Circuit Court of Appeals in Peterson v. BMI Refractories, Inc. (Peterson II), 132 F.3d 1405

(11th Cir. 1998):

> Plaintiffs Jimmie L. Peterson and Alonzo Reese are black males who were employed by BMI at its Birmingham, Alabama facility. Peterson worked as a laborer for BMI from 1990 or 1991[1] until his discharge on June 17, 1993. Reese was employed by BMI from 1987, 1988, or 1989[2] until his discharge on June 17, 1993. During their employment at BMI, both Reese and Peterson were members of the Laborers International Union of North America, AFL-CIO (the "Union"). The Union and BMI were parties to a collective bargaining agreement ("CBA"), and this CBA contained a grievance and arbitration procedure.
>
> While employed by BMI, neither Reese nor Peterson ever received any sort of oral or written reprimand from their employer due to their job performance and neither individual was ever disciplined due to poor job performance. At BMI, plaintiffs were supervised by and reported to foreman Larry Chambliss. Chambliss, in turn, reported to Larry Giangrosso, who in turn reported to construction superintendent Bert Rolley.
>
> In 1992, Reese was promoted to the position of labor foreman, a position requiring Reese to supervise other laborers and work alongside them. As a result of his promotion to foreman, Reese received a higher wage. Reese held this position for over a year. A white individual, Wayne Cookley, was also a foreman. Without notice or explanation, one day[3] Reese stopped receiving the wage of a foreman and his pay was reduced to that of a laborer. Wayne Cookley continued receiving a foreman's wage. Reese filed charges with the Equal Employment Opportunity Commission ("E.E.O.C.") as a result of this incident.
>
> Reese alleges that as a result of his filing a charge with the E.E.O.C., BMI took steps to retaliate against him. Reese was required to work under the supervision of Wayne Cookley, formerly Reese's equal, and James Giangrosso. According to the affidavits and deposition testimony of Reese and Peterson, Giangrosso was a major source of racial hostility in their workplace.[4]
>
> The racial hostility and discrimination at BMI was not limited to verbal abuse. Black employees were not given the same opportunities to advance as white employees were given, black employees were not given as many working hours as white employees were given, and black employees were forbidden from using the company trucks off of the

---

[1] Peterson states in his affidavit that he began working for the defendant in 1990. In his deposition, Peterson states he was hired by the defendant in 1991.

[2] In his affidavit, Reese states that he worked for the defendant from 1987 to 1993. However, his deposition testimony indicates that Reese worked for the defendant for six to eight weeks in 1987, and returned to work for the defendant in 1988 or 1989, and stayed there for "around five years."

[3] The record does not indicate the date the lower wage went into effect.

[4] In his affidavit, Reese asserts that Giangrosso asked Reese about the E.E.O.C. charge and told him he "went about it the wrong way"; and that Giangrosso also commented on several occasions that he "knew what [Reese's] problem is, you've been here too long." Reese and Peterson, in their affidavits, state that Giangrosso made racial taunts, often commenting to Reese when Reese was a labor foreman that "you think you white, don't you" and referring repeatedly to Reese and Peterson and other black employees as "nigger", "boy", and "you people". In his affidavit, Giangrosso denies the use of such language.

premises while white employees were allowed to make use of such trucks.[5]

The racial hostility at BMI even reached the point of violence and physical intimidation. Peterson and Reese describe an incident where a black laborer, Willie Jordan, was kicked by Randy Mann, a white brick mason, and plaintiffs testify that everyone in the workplace knew of the attack and that BMI did nothing about it. On another occasion, Mann grabbed Peterson in the presence of Giangrosso and threatened to throw him off a fifty foot scaffold. Giangrosso's response, Peterson states in his affidavit, was to laugh.

The incidents of racial hostility at BMI came to a head on June 16, 1993, when Peterson and Reese were working the night shift from 7 p.m. to 7 a.m.. Peterson was working with a white man from Pittsburgh[6] while trying to cut bricks. Peterson had seen the man talking with Giangrosso earlier. The man from Pittsburgh and Peterson exchanged words.[7] After Reese and Peterson took their lunch break, they returned to their work stations. Peterson and Reese found that a pallet of gunnite bags had been overturned near where they had been working. As Peterson bent over to pick up the bags, Peterson was kicked in the behind by Giangrosso.[8] Peterson did not report the kick to Rolley, the construction superintendent, because Rolley was not at work that day.

Later that same shift, Reese and Peterson were heading to clock out when they were approached by Giangrosso. Giangrosso was driving his truck[9] and another worker, Eddie Humphreys, was a passenger in the vehicle. Giangrosso instructed Peterson to get in the cab of the truck with him and instructed several workers, including Reese, to climb in the back of the truck. In his affidavit and in his deposition, Peterson states that Giangrosso pulled a nine millimeter pistol out of the glove box of the truck, pointed it in the general direction of Peterson, and said "You see this here, well I just want you to see it, that's all."[10] When the truck stopped and Peterson and Reese got out, Giangrosso instructed them to return to the work site at 3:00 p.m.

When Reese and Peterson returned to the site at 3:00 p.m., Chambliss gave them their final paychecks and said they were being fired because Giangrosso told Rolley that the pair were no longer needed, and that they were fired because of the incidents that had occurred the night before. The next day, Reese and Peterson went to the Union office to see

---

[5] Larry Chambliss, a labor foreman at B.M.I., stated in his affidavit that he was aware of the racially discriminatory atmosphere in the workplace.

[6] In his affidavit and in his deposition testimony, Peterson indicates he did not know this man's name. BMI disputes that this man from Pittsburgh even existed.

[7] Peterson asked the man to move his feet, which were in the way. The man from Pittsburgh called Peterson a "nigger" and told him that Peterson could not tell him what to do. Peterson told the man not to call him nigger and the man replied "Oh you goddamn nigger, you can't tell me what to do. I'm an expert in this here." Again, Peterson asked the man to move his feet and the man got up and left, saying "Goddamn you nigger boy."

[8] Peterson claims in his affidavit that he was kicked, causing his knees to buckle and causing him to fall to the ground. Giangrosso testified in his deposition that he merely tapped Peterson on the behind to get his attention. Chambliss, who witnessed the incident, describes the contact as a "kick" in his affidavit.

[9] Giangrosso's personal truck has a rebel flag on the front of the vehicle where a license plate would go.

[10] Giangrosso pointedly denies threatening Peterson with a pistol. He does admit keeping a nine millimeter pistol in his truck.

4

about filing a grievance to get their jobs back. Joe Black, Secretary/Treasurer of the local
chapter of the Union, told them the Union would not get involved in the matter.

Id. at 1406-07.

As the Eleventh Circuit Court of Appeals aptly noted, procedurally, this case has quite a "tortured history." Id.(quoting Peterson v. BMI Refractories (Peterson I), 124 F.3d 1386 (11th Cir. 1997). The court will not recount the procedural contortions which became the basis of the Eleventh Circuit Court of Appeals' decision in Peterson I, but will confine itself to the history relevant to the instant motion. The plaintiffs' complaint was originally filed in the Circuit Court of Jefferson County, alleging claims of race discrimination, harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981, and state-law claims of breach of contract, assault, battery, and outrage. After being dismissed without prejudice on June 9, 1995, for failure to perfect service of process, the suit was reinstated on July 31, 1995. BMI removed the case to federal court on September 1, 1995, after which the plaintiffs dropped their breach of contract claim.

On January 26, 1996, the defendants moved for summary judgment on the remaining claims. Among other grounds for granting summary judgment, the defendant argued that no evidence of discrimination exists and that the defendant could not be held liable for the torts of its employees. The district court, accepting the report and recommendation of the Magistrate Judge to whom the case was referred, dismissed the claims without prejudice on the grounds that the plaintiffs' Title VII claims were time-barred and that the § 1981 claim was subject to an mandatory arbitration clause in the collective bargaining agreement. Disagreeing with the Magistrate Judge, the court determined that the plaintiffs' assault and battery claims were also subject to the collective bargaining agreement. The defendant also filed, on October 10, 1996, a motion for summary judgment on the outrage claims, arguing, among other grounds, that the plaintiffs cannot establish the elements of outrage. The Magistrate Judge determined that the collective bargaining agreement controlled the outrage claims and stated that, because the plaintiffs failed to undergo arbitration, the claims should be dismissed. The district court adopted this recommendation, and the claim was dismissed without prejudice.

The plaintiffs appealed, arguing that the collective bargaining agreement did not require them to submit their complaints to a mandatory grievance and arbitration procedure before they filed

the § 1981 and state-law tort claims and that alternative grounds for affirmance proposed by the defendant did not prevent reversal of the district court's order.[11] In <u>Peterson II</u>, the Eleventh Circuit Court of Appeals determined that the collective bargaining agreement did not require the plaintiffs to undertake a grievance and arbitration procedure before bringing its federal and state claims. <u>Peterson II</u>, 132 F.3d at 1411-13.[12] In addition, the Court of Appeals determined that of the other grounds raised by the defendant for affirming the district court's opinion, "only the issue of the timeliness of plaintiffs' claims merit[ed] discussion." <u>Id</u> at 1413. The case was reversed and remanded to the district court.

On September 1, 1998, the defendant renewed its motion for summary judgment, reasserting those arguments that were not explicitly addressed in either the Magistrate Judge's Report and Recommendation, the district court's Order or the opinion of the Eleventh Circuit Court of Appeals.

## Contentions & Analysis

Under the law of the case doctrine any factual or legal issue decided in an earlier appeal is binding on all further action in the case either at the trial court or on subsequent appeal. See <u>Healthcoat v. Potts</u>, 905 F.2d 367, 370 (11th Cir. 1990). "The purpose of the law of the case doctrine is to establish efficiency, finality, and obedience within the judicial system." <u>Luckley v. Miller</u>, 929 F.2d 618, 621 (11th Cir. 1991). See <u>Burger King Corp. v. Pilgrim's Pride Corp.</u>, 15 F.3d 166, 169 (11th Cir. 1994). "Although the doctrine does not apply to every possible issue that a party may raise and is limited to those issues previously decided, binding precedent makes clear that the law of the case encompasses all things 'decided by necessary implication as well as those decided explicitly.'" <u>Id</u> (quoting <u>Wheeler v. City of Pleasant Grove</u>, 746 F.2d 1437, 1440 (11th Cir. 1984)).

The defendant argues that the law of the case doctrine does not apply to the instant case because the Eleventh Circuit Court of Appeals did not address the issues raised in the instant

---

[11] The plaintiffs did not contest the dismissal of the Title VII claims.

[12] The Supreme Court, in <u>Ceasar Wright v. Universal Maritime Service Corp.</u>, — U.S. —, — S.Ct. —, 1998 WL 788796 (November 16, 1998), bolstered the holding of the Eleventh Circuit Court of Appeals, stating that a general waiver clause in a CBA did not require that plaintiff pursue his remedies for disability discrimination under the Americans with Disabilities Act through the grievance procedure as an initial matter.

summary judgment motion and, even if it did, the issues were not the focus of the Eleventh Circuit Court decision and the comments of the Eleventh Circuit Court were instead mere dicta. The plaintiff disagrees, arguing that the Court of Appeals decision in Peterson II clearly encompassed the issues raised in the instant motion.

In arguing for affirmance of the district court's dismissal, the defendant raised the arguments that are the basis of its present motion for summary judgment. In response to the assertion of these arguments, the Court of Appeals stated that "only the issue of the timeliness of the plaintiffs' claims merits discussion." Peterson II, 132 F.3d at 1413. From this, it is clear that the Eleventh Circuit considered these alternative bases for affirmance of the district court's grant of summary judgment and found them sufficiently wanting that little or no discussion was required. Denial of summary judgment on the presently advanced grounds is necessarily implied from the opinion in Peterson II.

In contending that arguments not the focus of an appellate opinion are not barred by the law of the case doctrine, the defendant overstates the holding of Lawson v. Singletary, 85 F.3d 502 (11th Cir. 1996). In Lawson, the court was confronted with an interpretation of Florida's regulations prohibiting the dispersal of reading material prone to incite violence to inmates. The plaintiff argued that the regulations were violative of the First Amendment under the law of the case doctrine because, in an earlier case, Lawson v. Dugger, 840 F.2d 779 (11th Cir. 1988), the Eleventh Circuit Court of Appeals had found that a heightened standard of review was required in determining whether the regulations were violative of the First Amendment. The Eleventh Circuit Court rejected the argument that the determination of the standard of review in Lawson v. Dugger required a finding that the regulations were violative of the First Amendment, stating that "the crux of the dispute in Lawson II, and indeed in the whole first round of this litigation, was an agreement about the standard of review that should be applied to the Department's regulations." Id. In fact, in Lawson v. Dugger, the standard of review was the sole issue before and addressed by the Eleventh Circuit Court.

This is not the case here. The Eleventh Circuit Court of Appeals was briefed on and responded to the arguments raised in the instant motion by the defendant. Although not in the strict sense necessary for the Eleventh Circuit Court's decision to reverse and remand, the terse comment was not dicta either, as the appellate court had the authority to address any alternative arguments presented as a basis for upholding the district court's Order.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment will be DENIED.

DONE and ORDERED this 14th day of December 1998.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE